**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---

**ERIC RITTER; and**
**SPIROCHAETE RESEARCH LABS LLC;**

|  |  |
|---|---|
|  | Case No. 2:26-cv-00414 (ARL) |
| **Plaintiffs,** |  |
| **v.** | **FIRST AMENDED COMPLAINT** |
| **TAMARA RUBIN** | **JURY TRIAL DEMANDED** |
| **LEAD SAFE MAMA LLC,** |  |
|  |  |
| **Defendants**. |  |

---

Plaintiffs Eric Ritter ("Ritter") and Spirochaete Research Labs, LLC ("Spirochaete"), by their attorney, allege as follows ("Plaintiffs" refers to Ritter and Spirochaete collectively; "Plaintiff," in the singular, refers to Ritter):

## I. PRELIMINARY STATEMENT

1. This action arises from a sustained course of contractual breach and fraud. In April 2023, Defendants sold Plaintiff Ritter a full year of header-banner advertising on Defendants' websites for $90,000, memorialized in a signed contract (the "Contract") that included an express written refund provision (the "Refund Agreement"): should the advertiser determine that its product would not meet a stated product condition, Lead Safe Mama, LLC was obligated to repay the advance in monthly installments of $10,000. In the months that followed, Plaintiff paid Defendants for newsletter, video, and infographic services under three additional invoices and made further payments. The advertising never ran. The services went substantially undelivered. Plaintiff invoked the Refund Agreement in writing on March 16, 2024. To date, Defendants have repaid only $5,000.

2. Defendants accepted Ritter's money while concealing facts that bore on their ability and intention to perform. Two weeks before the Contract was signed, Rubin publicly acknowledged that her business's operating costs were not being covered. In late August 2023, she sent Ritter a spreadsheet itemizing $450,710.74 in debts and near-term expenses, including $236,492 in "Lawsuit Related Debt (Not to Lawyers)" owed to twenty named individuals, among them "Lendri $7,500," and solicited up to $462,000 more. Days later, she invoiced Ritter for exactly $7,500 in infographic deliverables, stating on the invoice that the funds would repay her creditor Lendri Purcell. Ritter paid; the deliverables never materialized. Throughout, Rubin invoked a "Federal Civil Rights legal battle" whose settlement proceeds would supposedly repay her creditors, while omitting that she had already lost that case on summary judgment.

3. Rather than honor the refund, Rubin set out to engineer it out of existence. On March 16, 2024, the very day Plaintiff invoked the Refund Agreement, she emailed Plaintiff a replacement instrument asserting a new annual rate of $115,000, premised on a projection of 12,500,000 page views that bore no relation to the websites' actual traffic. That figure exceeded, by exactly $2,500, the $112,500 in prior payments and credits the same instrument purported to apply, calibrated so that the advertising period could be declared "paid in full" with nothing left to refund. The instrument contained no refund provision; it omitted Plaintiffs' three-year product exclusivity; it barred application of the advertising to Plaintiffs' new product; and it required the advertising banner to route through Defendants' own Amazon affiliate link. Plaintiff refused to sign. Two days later, Rubin declared that the parties "no longer have any agreements."

4. Plaintiffs seek compensatory damages, including the $85,000 unrefunded balance of the advertising advance and the sums paid for services never delivered, together with prejudgment interest, punitive damages on the fraud claim, and a declaration that the March 2024 instrument

never took effect and that the original Contract, including the Refund Agreement and the exclusivity provision, remains in full force.

## II. THE PARTIES

5. Plaintiff Eric Ritter is a natural person domiciled at 5 Woodridge Lane, Coram, New York 11727, in Suffolk County. He is registered to vote in New York, holds a New York driver's license, files and pays New York State income tax, maintains his primary bank and brokerage accounts in New York, uses physicians and professional advisors in New York, and intends to remain in New York indefinitely. On January 23, 2026, he was, and he remains, a citizen of the State of New York and of no other State. During the events alleged herein, Ritter conducted business from 690 Route 25A, Suite 3, East Setauket, New York 11733; his business has since relocated to 9 Technology Drive, East Setauket, New York 11733.

6. Plaintiff Spirochaete Research Labs, LLC is a New York limited liability company (New York Department of State ID 4972914) doing business under the assumed name "Scitus Lab Products," with its principal place of business in East Setauket, New York. Its sole member is Eric Ritter, a citizen of New York. On January 23, 2026, Spirochaete was, and it remains, a citizen of the State of New York and of no other State. See *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016).

7. Defendant Tamara Rubin is a natural person domiciled at 7933 Southeast 15th Avenue, Portland, Oregon 97202, in Multnomah County. She has resided in Portland for many years; conducts her business and advocacy from Oregon; signed filings with the Oregon Secretary of State identifying that Portland address in each year from 2018 through 2026; and filed her own lawsuit against these Plaintiffs in Multnomah County, Oregon, as a resident of that county. Her international travel

during 2023 and 2024 was temporary, and she maintained her Portland residence, business registrations, and Oregon filings throughout. On January 23, 2026, she was, and she remains, a citizen of the State of Oregon and of no other State. See *Van Buskirk v. United Grp. of Cos.*, 935 F.3d 49, 53-54 (2d Cir. 2019).

8. Defendant Lead Safe Mama, LLC ("LSM") is an Oregon limited liability company (Oregon Secretary of State registry number 1394293-93) with its principal place of business at 7933 Southeast 15th Avenue, Portland, Oregon 97202. Its sole member is Tamara Rubin, a citizen of Oregon, and no filing in the company's history has identified any other member. The most recent filing predating this action, the Amended Annual Report e-filed January 10, 2026 (Exhibit Q), identifies Rubin as the sole manager and registered agent and is electronically signed by her, subject to the statutory attestation that no manager, member, or agent has been fraudulently concealed. Upon information and belief, Rubin is the sole member of LSM: she organized and named the company after her own "Lead Safe Mama" persona, is its sole manager, registered agent, and authorized signatory, and has at all times exercised exclusive ownership and control of it; no other person or entity holds, or has ever held, a membership interest in LSM. Rubin's son Alexander appeared as a co-manager from January 2020 until his removal effective the January 2, 2025 filing; managers are not members, and he has not appeared since. No member of LSM, and no person or entity whose citizenship is attributable to LSM through any tier of ownership, was a citizen of New York on January 23, 2026, or is one now. On January 23, 2026, LSM was, and it remains, a citizen of the State of Oregon and of no other State.

### III. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). Both Plaintiffs are citizens of New York; both Defendants are citizens of Oregon; and the amount in controversy exceeds $75,000, exclusive of interest and costs. Diversity is measured as of January 23, 2026, the date this action was commenced (Doc. 1). See *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004); *Freeport-McMoRan Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991).

10. Venue lies in this District under 28 U.S.C. § 1391(b)(2). Defendants negotiated and entered into the contracts at issue with Plaintiffs located in this District; directed hundreds of contract and solicitation communications to Plaintiffs here; accepted payment from Plaintiffs' accounts here; and conducted the advertising campaign funded by the disputed payment in New York, with its unused materials warehoused in Maspeth, Queens, within this District.

11. This Court has personal jurisdiction over each Defendant under N.Y. C.P.L.R. § 302(a)(1). Defendants transacted business within New York and contracted to supply goods or services in New York by, among other things: (a) negotiating and executing a written advertising contract with Plaintiffs, counter-signed by Defendant Rubin, obligating Defendants to provide twelve months of advertising and related services to counterparties Defendants knew were in New York; (b) accepting payments transmitted from Ritter's New York bank accounts to Defendants' Bank of America account; (c) communicating with Plaintiff Ritter at his New York email address and New York telephone number in hundreds of emails and iMessages from March 29, 2023 through May 31, 2024, concerning the purchase, performance, and modification of the contracts at issue; (d) expending a portion of the contract proceeds on a New York City subway advertising campaign that ran in the New York City subway system in May and June 2023; (e) transmitting the August 27, 2023 written solicitation seeking up to $462,000 in additional funds, and the August 29, 2023

proposal with invoices billed to Plaintiff Ritter at his New York addresses; and (f) emailing the March 2024 replacement instrument to Plaintiff Ritter in New York, for signature in New York.

12. These contacts are purposeful, substantial, and directly related to the claims pleaded. Defendant Rubin's contacts were undertaken both individually and in her capacity as the sole member and manager of Lead Safe Mama, LLC, and New York does not recognize the fiduciary-shield doctrine. See *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 470-72 (1988).

### IV. FACTUAL ALLEGATIONS

*A. The April 2023 Contract and Plaintiffs' Payments*

13. On April 21, 2023, the parties executed the Contract, a written agreement memorialized in signed Lead Safe Mama, LLC Invoice No. 2023041401, dated April 17, 2023 and countersigned by Defendant Rubin and Plaintiff Ritter on April 21, 2023. The Contract is billed to "Eric Ritter, Owner (Advertiser)," company "Scitus / Spirochaete Research Labs, LLC," at Plaintiffs' East Setauket, New York address. The Contract identifies Ritter as the "Advertiser." A true and correct copy of the signed Contract is attached as Exhibit A.

14. Under the Contract, Plaintiffs agreed to pay $90,000 for one "Year of Header Banner Advertising on LeadSafeMama.com / Tamararubin.com," to run for twelve consecutive months with a start date to be determined. Plaintiffs paid the $90,000 by wire transfer, and Rubin itemized that payment in her own March 2024 instrument as three wires of $5,000, $50,000, and $35,000, totaling the "$90,000" she there labeled the "Advertising Sponsorship Fee" and recorded as received (Exhibit C, Section 5). The $50,000 and $35,000 wires were sent on April 25, 2023 from Plaintiff Spirochaete's New York Chase business account (account ending 2210) to Defendants'

Bank of America account, as reflected on the statement attached as Exhibit V; Rubin confirmed receipt in writing that day: "$ landed! Ty!" Defendants accepted and retained the $90,000.

15. The Contract included the Refund Agreement, which reads in full: "Should, at any time on or after November 1, 2023, Advertiser determine their product is not going to meet condition #2 above, Lead Safe Mama, LLC will refund the $90,000 paid with this invoice, at a rate of $10,000 per month (without interest) until the $90,000 is repaid in full. The first $10,000 payment will be made 30 days after written notice is given that the product will not meet this condition."

16. Condition 2 of the Contract, the condition cross-referenced in the Refund Agreement, reads in full: "Advertising placement is contingent on Advertiser's product meeting or exceeding Lead Safe Mama, LLC's standards for comparable products (using the efficacy and known current limitations of the 3M LeadCheck(R) product as a benchmark for paint testing.)" By its express terms, the refund right is triggered by the Advertiser's own determination, communicated by written notice, that the product will not meet Condition 2.

17. Condition 4 of the Contract provides that any other advertisement occupying the header spot "will be temporary placements until Advertiser exercises this option or chooses to not go ahead with this opportunity and requests a refund." The refund exit thus coexisted with, and survived, every other term of the Contract.

18. Condition 5 of the Contract provides in full: "If and when the new product Advertiser has in the prototyping phase (glowing reactive agent product gets approval for production and if, at that time it meets Lead Safe Mama, LLC's standards for use by consumers to test for Lead - as discussed to date between the parties), Tamara Rubin (and Lead Safe Llama, LLC [sic]) agree to grant Advertiser and his company(s) the exclusive right to advertise this type of product on

Leadsafemama.com/Tamararubin.com (specifically agreeing that Lead Safe Mama, LLC will not engage promotion of a comparable product other than the Advertisers [sic] for a period of 3 years)." Defendant Rubin is named personally as a promisor of this provision.

19. The Contract states that the $90,000 rate "is based on 9,000,000 anticipated / projected annual page views on the site for the 2023 calendar year," at "one penny per page view / one penny per advertising impression," and that the rate "includes linking advertising banner to page or site of choice for Advertiser." Condition 3 provides in full: "Should Advertiser not be in a position to start the Ad placement on or before March 1, 2024 the 12-month advertising rate will be adjusted to reflect current anticipated / projected page views for that calendar year at that time (at one penny per page view) and the $90,000 paid with this invoice will be used as a credit against the current rate at the time of the start date or any start date after MARCH 1, 2024 (with the difference in annual rate due and payable at that time to begin advertising)." By its terms, Condition 3 authorizes an adjustment of the rate, on the stated page-view formula, and nothing more.

20. During the contracting exchange, on or about April 19-20, 2023, Rubin wrote to Plaintiff by text message: "Oh do you want to do it as a loan? Or as pre-paid advertising? The contract was for a loan… it's up to you." (Exhibit R.) Rubin thus confirmed in writing the refundable character of the advance. Consistent with that course of dealing, Rubin separately borrowed $5,500 from Plaintiff on September 27, 2023 and repaid that small loan in full in December 2023; that $5,500 loan forms no part of the damages claimed here. By contrast, against the $90,000 advance Defendants have returned only a single $5,000 payment (paragraph 44), and nothing since.

21. In August and September 2023, Plaintiffs also paid Defendants under three further LSM invoices (Exhibits P, J): $9,000 for newsletter sponsorship (Invoice 2022EC04042, issued August

29, 2023, for twelve months of linked banners in the LSM email newsletter); $13,998 for a three-video production project (Invoice 2022EC04043, issued August 29, 2023, against which Rubin confirmed a $4,000 payment on August 31, 2023); and $7,500 for infographic deliverables (Invoice 2022EC04044, dated September 5, 2023, described in paragraph 35), $30,498 in all. Plaintiffs also purchased a computer and accessories for Defendants' use for approximately $6,000 and made further payments to Defendants, the full accounting of which is reserved for proof at trial.

22. On September 6, 2023, Rubin confirmed in writing that the twelve-month advertising term had not commenced and that the header placement was being held for Plaintiffs' forthcoming product: "This will not count as the start of your use of the header spot - since we agreed that we are holding that spot for your new product …" (Exhibit M.) The header-banner advertising purchased under the Contract never ran.

23. On December 31, 2024, Defendants paid Plaintiff Ritter $5,000. Apart from that single payment and the repaid $5,500 loan, Defendants have returned no part of the sums they received.

### B. Rubin's Pre-Contract Knowledge of LSM's Cash-Flow Shortfalls

24. On April 7, 2023, exactly two weeks before the Contract was signed, Rubin posted publicly on the Lead Safe Mama website that "the costs of running the business two months later (in April 2023, now) are not covered" (emphasis in original), explaining that the business depended month to month on page-view revenue and reader donations. The Internet Archive captured the post, including that statement, on April 7 and again on April 16, 2023, and the post remained live through the date of contracting. True copies of the archived 2023 captures, together with the post as it currently appears, are attached as Exhibit F.

25. On June 27, 2023, Rubin posted publicly that "[w]ith costs related to our New York City Subway PSA Campaign this month, Lead Safe Mama, LLC is closing out the month with a shortfall of more than $3,836.95." (Exhibit H.)

26. On July 13, 2023, during the contract period, Rubin publicly acknowledged that her financial circumstances dictated where she could afford to live and work, writing that it was "less expensive" for her to spend "nearly 2-1/2 months traveling in Europe … than it would have been to stay home." (Exhibit I.)

### C. The $90,000 and the Subway Campaign

27. Before the Contract was signed, Rubin pitched Plaintiff a New York City subway public-service-announcement campaign of approximately 2,000 panels across four designs, and asked Plaintiff to fund 1,000 of them, representing that she would secure the balance elsewhere. Rubin placed the panels through OUTFRONT Media, the company that sells New York City subway advertising, through a representative she identified as Diego Soriano.

28. On April 23, 2023, two days after the Contract was signed and while Plaintiffs' transfers were still arriving, Rubin posted publicly: "[w]e secured funding for the Lead Safe Mama, LLC New York City Subway PSA Campaign!" (Exhibit G.) On April 25, 2023, the day the final transfers arrived, Rubin told Plaintiff that the funds would be "mostly gone by tomorrow," after she paid "the subway advertiser" and "the photographer."

29. The subway campaign ran as a single placement from approximately May 15 to June 11, 2023.

30. At Rubin's direction, Plaintiff Ritter took possession of 621 unused subway advertising panels from the campaign's warehouse, Rubin having stated that she had not yet "figured out what to do

with them." At her further direction, Plaintiff later delivered most of the panels to a third party connected to Lead Safe Mama, and retains the remainder. Photographs of the retained panels, authenticated by the Declaration of Eric Ritter, are attached as Exhibit O. Six hundred twenty-one undeployed panels represent a substantial fraction both of the approximately 2,000-panel campaign Rubin proposed and of the 1,000 panels Plaintiff was asked to fund.

### D. The August and September 2023 Solicitations and the Lendri Invoice

31. On August 25, 2023, Rubin emailed Plaintiff Ritter a lengthy proposal (Exhibit L) in which she itemized loans she owed to private individuals, described her "total debt right now" as "about $272,500," attributed those debts to her "Federal Civil Rights legal battle," which she characterized as "suing the State of Oregon in Federal Court for their role in attempting to destroy my work and my reputation," and invited Plaintiff to help cover them through "a loan to the business - to be repaid, or as a credit against future sponsorships." She added that "my plan has always been to pay these people (and everyone else) back … out of income from the sale of the farm (or proceeds from the Civil Rights lawsuit being settled.)"

32. On August 27, 2023, Rubin emailed Plaintiff, under the subject line "$$$ :-) & Thoughts [Another long email - lol!]," a written proposal soliciting an investment "in the partnership of $312,000," plus an advance of up to $150,000, "which could bring us to a total of $462,000," explaining that she would "use most of that to pay down the debt related to my legal battle and cover other debts …" She attached a spreadsheet she had prepared, titled "Sunday - August 27, 2023," itemizing $450,710.74 in "Total Debt & Expenses," including $236,492 in "Lawsuit Related Debt (Not to Lawyers)" owed to twenty named individuals, among them the line item "Lendri $7,500." (Exhibit E.)

33. On August 28, 2023, Rubin wrote to Plaintiff, under the subject line "just passed 4,000,000 page views for the year," that the Lead Safe Mama website had just passed 4,000,000 page views for the year, an annualized rate of approximately 6,000,000 page views. (Exhibit S.)

34. On August 29, 2023, Rubin sent Plaintiff a written "Proposed Plan / Scenario #1" (Exhibit K), attaching draft invoices for video and newsletter-sponsorship services and proposing, among future considerations, an advance against future affiliate sales "in the $50,000 to $150,000 range," expressly "to help with Lead Safe Mama cashflow / loan payments."

35. On September 5, 2023, Rubin emailed Plaintiff LSM Invoice 2022EC04044 for $7,500, for a "2023 Special Project" described as "Contents / Graphic Mockups For Lead-in-Consumer-Goods (& Lead-In-Housing?) Info sheets / PDFs," and bearing the printed notation: "Transparency Note :-): Funds will be used to repay loan made by Lendri Purcell." In the transmitting email she wrote: "I am sending Lendri a note now that I will be paying her back." (Exhibit J.) The invoiced amount was identical to the "Lendri $7,500" debt on the spreadsheet Rubin had sent nine days earlier. Plaintiff Ritter paid the $7,500 on or about September 5, 2023; Defendants' own billing records reflected a zero balance on the invoice by September 6, 2023.

36. On September 6, 2023, Rubin wrote to Plaintiff that money "goes through my bank account faster than water through a fire hose turned on full blast (and this will be the case until my Civil Rights lawsuit debt is 100% paid off)," in the same message asking Plaintiff to cover further costs. In that same email she explained, in writing, that she invoiced and tracked the funds Plaintiff sent her as "payment for a reciprocal benefit" because doing so created "better optics" "if I am ever audited - or if our business relationship is ever questioned." (Exhibit M.)

37. The infographic deliverables for which Plaintiff paid $7,500 were never produced or delivered. Rubin's own March 2024 instrument concedes, at Section 5, "proposed infographic work that has not been completed."

38. At no point in these solicitations did Rubin disclose that the United States District Court for the District of Oregon had granted summary judgment against her on every claim in the "Civil Rights" case on July 13, 2022 and dismissed the case. *Rubin v. State of Oregon*, No. 3:19-cv-01377-IM (D. Or. July 13, 2022) (Immergut, J.). The United States Court of Appeals for the Ninth Circuit affirmed on January 10, 2024. *Rubin v. State of Oregon*, No. 22-35640 (9th Cir. Jan. 10, 2024) (unpublished mem.) (Exhibit D). Her written representation that her creditors would be repaid from "proceeds from the Civil Rights lawsuit being settled" thus described the proceeds of a case she had already lost more than a year before she made the representation.

39. Plaintiff did not learn of the July 13, 2022 summary judgment, or the true posture of the litigation whose debts he had been solicited to fund, until 2026, when he obtained the underlying records through public-records requests.

### E. The Refund Invocation and the Acknowledgment of Receipt

40. On March 16, 2024, Ritter invoked the Refund Agreement in writing, twice. By text he wrote: "the swabs don't meet the requirements of the contract so I'd like to give notice to pay it back- do you need more formal documentation? Or is this sufficient," adding, "I'll just email that to you also" (Exhibit R); and by email the same day, "the scitus swabs dont satisfy #2 of our previous agreement" (Exhibit N). The Refund Agreement makes the Advertiser's written determination the trigger of the refund obligation; that determination was Ritter's to make, he made it in good faith, and he gave notice after November 1, 2023, as the clause requires. Rubin disputed the

determination, asserting that "[t]he swabs do meet the standards of Lead Safe Mama, LLC" (Exhibit R), but did not pay.

41. Rubin has acknowledged in writing that she received substantial sums from Plaintiff that have not been repaid. Plaintiffs' prior counsel recited, in his June 6, 2024 demand letter (Exhibit B), that Rubin had acknowledged on March 16, 2024 receiving $149,500, of which at least $112,500 had not been repaid "either directly or through marketing services." Rubin's own March 2024 instrument credits $112,500 in prior payments and concedes a further $14,000 of Plaintiff's funds as already "used / applied" (Exhibit C, Section 5). Counsel restated the demand figures in writing directly to Rubin on June 17, 2024; Rubin responded in writing twice on June 20, 2024, engaging the substance of the demand, and disputed neither the receipt nor the unrepaid balance. (Exhibit T.)

42. The June 6, 2024 letter (Exhibit B) formally demanded repayment. Its figures credited Defendants, based on the information then available to counsel, with marketing services that Plaintiffs' subsequent investigation has shown were not delivered or not retained, including the video Defendants later deleted and the newsletter sponsorship pleaded below.

43. On June 24, 2024, Plaintiff Ritter again gave written notice, stating: "I have made the determination that the Fluoro-Spec product will not meet your standards," and noting that he had reached that determination months earlier, "when i asked for the money back prior." (Exhibit T.) In the same email, Plaintiff asked whether the newsletter-sponsorship banner had been removed and requested a prorated refund of that payment.

44. Under the Refund Agreement, the first $10,000 installment fell due thirty days after the March 16, 2024 notice, on April 15, 2024, with successive installments due monthly thereafter; at the very

latest, the obligation matured thirty days after the June 24, 2024 notice. Defendants made a single $5,000 payment, on December 31, 2024, and nothing since. The unrefunded balance of the advance is $85,000.

*F. The March 2024 Replacement Instrument*

45. On March 16, 2024, Rubin emailed Plaintiff a three-page document styled "Advertising Contract Agreement" (the "Replacement Instrument"), drafted by Rubin and footer-dated March 15, 2024, and presented as the instrument required to continue the advertising relationship at the adjusted post-March 1, 2024 rate that Condition 3 contemplated. (Exhibits C, N.) In the transmitting email, Rubin wrote that "a primary term of our original agreement … expired on March 1, 2024," that she could not risk advertising Plaintiffs' new glowing product in light of a third party's "presumed" international patent, and that "[t]he simplest thing for us to close out our relationship would be for you to sign the new agreement." (Exhibit N.)

46. At Section 4, the Replacement Instrument asserts that "[t]he current LSM advertising rate (RATE) for 2024/2025 for the ADVERTISING BANNER on the WEBSITE for a 12-month placement beginning on-or-before April 1, 2024 is $115,000." Its sole stated basis is a footnote projecting 12,500,000 unique page views (9,500,000 at the low end) for the coming twelve months, while conceding that "page views / impressions are not guaranteed at any time."

47. That projection had no basis in the websites' actual traffic. Rubin's own August 28, 2023 email put the sites at approximately 6,000,000 page views on an annualized basis (Exhibit S), and her own published traffic history showed monthly page views above 1,000,000 in only three months in the site's history (Exhibit F). The $115,000 figure tracks nothing in the Contract's one-penny-per-projected-page-view formula; applied at one penny per view, even the instrument's own low-

end 9,500,000-view projection would yield approximately $95,000. The $115,000 figure exceeds, by exactly $2,500, the $112,500 in prior payments and credits that the same instrument elected to apply.

48. At Section 5, the Replacement Instrument recharacterized $112,500 of the money and property Ritter had already transferred as "credits to be applied" against the new rate, itemizing the $90,000 advertising payment, the $7,500 infographic payment for work it concedes "has not been completed," approximately $6,000 for the computer and accessories, and $9,000 of the video-project payment, reaching a stated "TOTAL CREDITS TO BE APPLIED" of $112,500. Separately, the instrument treated a further $14,000 of Ritter's payments, comprising the $9,000 newsletter sponsorship and $5,000 toward the first video, as already "used / applied." At Section 8(B), it declared that on Ritter's signature "the 12-month ADVERTISING PERIOD will be considered paid in full," characterizing the $2,500 difference between the $115,000 rate and the $112,500 in applied credits as "a reduction in cost … (to the benefit of the advertiser)." The instrument's evident purpose was to consume Ritter's payments against an unsupported rate, leaving no refund owed and no further services due.

49. The Replacement Instrument, which states at Section 1 that it "supersedes all Terms & Conditions" of the Contract, contains no refund provision and omits the Condition 5 exclusivity. It provides at Section 6(B) that the agreement "is not transferrable to an alternate product," foreclosing application of the advertising to Plaintiffs' glowing reactive-agent product, and at Section 7(C) that the banner "will link to the Amazon listing for the PRODUCT (via a LSM Amazon affiliate link)," contrary to the Contract's term that the banner links to the "page or site of choice for Advertiser." The instrument nowhere identifies the Refund Agreement or the exclusivity

as rights being surrendered, or assigns them any value. Condition 3 authorized an adjustment of the rate, and nothing else.

50. Plaintiff rejected the Replacement Instrument in writing that same day, March 16, 2024: "theres also no provision to transmute the work you owe me into advertising dollars, especially when you predicate the value on projections that were missed last year and are even more grandiose going forward." (Exhibit N.) Plaintiff never signed it, and by its own Section 8(C) it expired unexecuted on March 29, 2024.

51. On March 18, 2024, Rubin wrote to Plaintiff: "My interpretation is that we're done working together and that we no longer have any agreements, or do you still want us to work together somehow…" Plaintiff replied the same day: "Yeah of course I want to complete the agreements we already made!!" On March 19, 2024, Rubin conditioned any continued relationship on either legal clearance of the glowing product to her satisfaction or Plaintiff's signing the Replacement Instrument: "If we cannot both be legally confident about your use of the glowing technology, I'm happy to go forward with the new agreement I sent over on Saturday." (Exhibit U.)

*G. Defendants' Destruction of the Bargained-For Value and Promotion of a Competing Product*

52. After receiving Plaintiffs' payments, Defendants deleted the sole collaboration video featuring Plaintiffs' products from their public platforms; removed references to Plaintiff Ritter and Plaintiffs' products from their websites and social media; and suppressed public comments mentioning Plaintiffs and their products in channels Defendants moderate.

53. Defendants also promoted Lumetallix, a glowing reactive-agent lead-test product directly comparable to Plaintiffs'. In November 2023, with Plaintiffs' limited consent, given while Plaintiff was the product's United States reseller, Rubin published an article about the product on tamararubin.com. After the parties' relationship ended in March 2024, Defendants kept the article live, updated it on October 22, 2024, and continued to promote the competing product through their own Amazon affiliate link; members of Defendants' moderated Facebook group purchased Lumetallix kits through that ecosystem as late as March 2025, with Defendants' group administration directing buyers to it; and the article remained live, with Defendants' affiliate link, as of June 6, 2026.

## V. FIRST CAUSE OF ACTION: BREACH OF CONTRACT

(The Refund Agreement; by Plaintiffs against Lead Safe Mama, LLC)

54. Plaintiffs incorporate paragraphs 13 through 23 and 40 through 44 as though fully set forth herein.

55. The Contract is a valid and binding agreement, and it was never superseded or modified, because the March 2024 Replacement Instrument was never executed and expired unexecuted by its own Section 8(C) (paragraph 50). Plaintiffs performed by paying the $90,000 price.

56. Plaintiff invoked the Refund Agreement by written notice on March 16, 2024 and again on June 24, 2024, each given after November 1, 2023 and upon the Advertiser's determination that the product would not meet Condition 2. Whether measured by the swab product named in the March 16, 2024 notices or the Fluoro-Spec product named in the June 24, 2024 notice, the Advertiser's written determination under Condition 2 was made and communicated. LSM thereby became obligated to repay the advance in monthly $10,000 installments beginning April 15, 2024,

or, at the latest, beginning thirty days after the June 24, 2024 notice. The Advertiser's determination was made honestly and in good faith, based on the product's actual performance and known limitations, and all conditions precedent to LSM's refund obligation were thereby performed or satisfied. Because the Refund Agreement makes the Advertiser's own determination the operative trigger, Rubin's contrary assertion that the swabs met LSM's standards did not excuse the refund obligation.

57. LSM paid $5,000 on December 31, 2024 and nothing further. Plaintiffs have been damaged in the amount of $85,000, plus prejudgment interest at 9% per annum under CPLR 5001 and 5004 on each unpaid installment from the date it fell due.

## VI. SECOND CAUSE OF ACTION: BREACH OF CONTRACT

*(The Condition 5 Exclusivity; by both Plaintiffs against both Defendants)*

58. Plaintiffs incorporate paragraphs 13 through 23 and 45 through 53 as though fully set forth herein.

59. Condition 5 of the Contract obligates Tamara Rubin and Lead Safe Mama, LLC to grant Plaintiff Ritter and his companies, including Plaintiff Spirochaete, the exclusive right to advertise Plaintiffs' glowing reactive-agent product on Defendants' websites, and to refrain from promoting any comparable product, for a period of three years. Condition 5 is sufficiently definite to enforce: it identifies the promisors (Rubin and LSM), the beneficiaries (Ritter and his companies), the protected subject (Plaintiffs' glowing reactive-agent lead-test product), the medium (Defendants' websites), the exclusive right and the correlative promise not to promote a comparable product, and a fixed three-year term.

60. The product evaluated under Condition 2 (the swab product, benchmarked against the 3M LeadCheck paint-testing standard, paragraph 16) and the product protected by Condition 5 (Plaintiffs' glowing reactive-agent product, measured against Lead Safe Mama, LLC's consumer-use standard, paragraph 18) are different products measured against different benchmarks. Ritter's determination that the swab product would not meet Condition 2 therefore neither bears on nor contradicts the Condition 5 exclusivity for the glowing product.

61. Plaintiffs' glowing reactive-agent product (Fluoro-Spec) received approval for production and began shipping in March 2024, as Rubin herself acknowledged in writing on March 16, 2024: "you just started shipping your new glowing product this week." (Exhibit N.) Plaintiff furnished product samples to Defendants in April 2024. Defendants never completed any evaluation of the product, never granted the exclusive advertising right, and never placed any advertising. To the extent Condition 5 further required that the product meet LSM's standards upon approval for production, satisfaction of that requirement was prevented and excused by Defendants' own conduct: the Replacement Instrument Rubin pressed Plaintiff to sign excluded the glowing product entirely and omitted the exclusivity (paragraph 49); Rubin declared in writing on March 18, 2024 that the parties "no longer have any agreements" (Exhibit U); and Defendants never performed the evaluation they acknowledged owing. A party may not rely on the non-occurrence of a condition that its own breach of the implied covenant of good faith has caused.

62. Independent of whether the affirmative exclusive-advertising right ever vested, Condition 5's negative covenant, Defendants' promise not to promote a comparable product for three years, bound Defendants on its own terms. Defendants breached Condition 5 both by repudiating the exclusivity and by promoting Lumetallix, a comparable competing product, on the same websites and through the same affiliate channel the exclusivity was meant to protect, as alleged in paragraph

53. Plaintiffs were thereby deprived of the three-year exclusivity for which they bargained, and were damaged in an amount to be determined at trial, including the value of the lost exclusivity and Plaintiffs' reliance expenditures.

## VII. THIRD CAUSE OF ACTION: BREACH OF CONTRACT

(The Service Invoices; by Plaintiffs against Lead Safe Mama, LLC)

63. Plaintiffs incorporate paragraphs 13 through 23 and 31 through 37 as though fully set forth herein.

64. Plaintiff Ritter and LSM entered into three separate written agreements (Exhibits P, J): (a) newsletter sponsorship for $9,000 (Invoice 2022EC04042) calling for twelve months of linked sponsorship banners in the LSM email newsletter; LSM did not provide the sponsorship for the full contracted term and, upon information and belief, removed the sponsorship banner before the twelve-month period expired, and it left Ritter's June 24, 2024 written request for confirmation and a prorated refund (Exhibit T) unanswered; (b) a three-video production project for $13,998 (Invoice 2022EC04043), of which LSM produced only one of the three videos and then deleted even that one from its platforms, delivering no enduring benefit; and (c) infographic deliverables for $7,500 (Invoice 2022EC04044), which LSM never produced, as Rubin's March 2024 instrument concedes.

65. LSM breached each agreement. Plaintiffs have been damaged in the amount of $30,498, representing the sums paid for services that were not delivered or not retained, or in such lesser amount as the proof establishes, plus prejudgment interest at 9% per annum from the dates the services should have been rendered or from a reasonable intermediate date under CPLR 5001(b).

## VIII. FOURTH CAUSE OF ACTION: UNJUST ENRICHMENT

(In the Alternative; by Plaintiffs against both Defendants)

66. Plaintiffs incorporate paragraphs 13 through 23, 31 through 37, and 40 through 44 as though fully set forth herein, but not any allegation that a valid contract governs the payments described in this Count.

67. Beyond the payments governed by the Contract and the three invoices, Defendants received and retained money and property from Plaintiffs for which no written agreement provides, including the computer and accessories that Defendants' own March 2024 instrument valued at approximately $6,000 and elected to credit as Plaintiffs' payment (Exhibit C), and additional payments Plaintiffs made to Defendants. Defendants were thereby enriched at Plaintiffs' expense, and equity and good conscience require restitution of those sums, in an amount to be established at trial. In the further alternative, should any of the written agreements be held unenforceable or inapplicable, Plaintiffs are entitled to restitution of all sums paid under them and not returned.

### IX. FIFTH CAUSE OF ACTION: FRAUD
### (FRAUDULENT INDUCEMENT BY CONCEALMENT)
(by Plaintiffs against both Defendants; in the alternative to the First Cause of Action as to overlapping sums; no double recovery)

68. Plaintiffs incorporate paragraphs 13 through 53 as though fully set forth herein.

69. To induce the refundable advance under the Contract, which Rubin herself characterized in writing as a loan (paragraph 20, Exhibit R), Rubin represented to Plaintiffs that she could and would repay it. That representation carried with it a representation of present fact, that Rubin's and LSM's then-existing financial condition allowed repayment, a fact distinct from, and collateral to, the promise of future repayment itself.

70. That present fact was false when the advance was made, and Rubin concealed it. When she solicited and accepted the advance, LSM was already carrying substantial debt it could not service. The debt was not new. It pre-dated the advance and included long-standing litigation-related debt: Rubin had lost her "Civil Rights" case on summary judgment in July 2022, nine months before the advance (paragraph 38), so neither that case nor any settlement of it could ever fund repayment. Two weeks before the advance, Rubin publicly admitted that the business's operating "costs … are not covered" (Exhibit F). Upon information and belief, LSM's liabilities already exceeded its capacity to repay the advance in April 2023. Rubin did not disclose any of this; to the contrary, she affirmatively represented that she could repay, and she did not reveal the scope of her debt until months later, when she itemized $450,710.74 in debts and expenses on August 27, 2023 (Exhibit E).

71. Having affirmatively represented that she could repay, Rubin was under a duty not to conceal facts that rendered that representation misleading; her concealment of her existing, unmanageable debt made the representation a half-truth and a fraud. The concealed facts, Rubin's true financial condition and the dead litigation she invoked as her source of repayment, were peculiarly within her knowledge and not reasonably discoverable by Plaintiffs in the exercise of ordinary diligence.

72. Plaintiffs reasonably relied. They advanced the money because Rubin represented she could repay it and because they did not know, and had no way to know, that she was already insolvent; Rubin alone controlled her financial information. Had Plaintiffs known her true financial condition, they would not have made the advance.

73. Rubin made the representation knowingly, or with reckless disregard for its truth, and with the intent that Plaintiffs rely upon it. Her contemporaneous conduct confirms that she was engaged in

obtaining Plaintiffs' money by misrepresentation, not in an honest deal gone wrong: within days of receiving the advance she told Ritter the money would be "mostly gone by tomorrow" (paragraph 28) while retaining the repayment obligation; she solicited up to $462,000 more by representing her debts and Plaintiffs' repayment would come "from proceeds from the Civil Rights lawsuit being settled" (Exhibit L), concealing that she had already lost that case on summary judgment on July 13, 2022 (paragraph 38, Exhibit D); she represented the New York City subway campaign would run and drive traffic, took Plaintiffs' funding for approximately 1,000 panels, and left at least 621 undeployed (paragraph 30, Exhibit O); she billed Plaintiffs for services and routed at least one invoice to her personal creditor, admitting in writing that she invoiced the funds "for better optics … if I am ever audited" (Exhibit M, J, E); and when Ritter invoked his refund, rather than repay, she fabricated a 12,500,000-page-view figure to manufacture a $115,000 rate sized to consume Plaintiffs' payments and declare the relationship "paid in full" (paragraphs 45 through 48, Exhibit C, N).

74. When Plaintiffs advanced the refundable money in April 2023, they did not know, and Rubin did not disclose, the true scope of her debt or that she had already lost the Civil Rights case on summary judgment; Plaintiffs did not learn those facts until 2026, after they had relied on Rubin's representation and parted with the advance. The further sums Plaintiffs paid Defendants after the advance were not additional loans but prepayments for specific services, the newsletter, video, and infographic work described above, which Defendants either never completed or, having begun, destroyed.

75. This claim does not rest on Defendants' mere failure to perform the Refund Agreement; it rests on Rubin's misrepresentation and concealment of then-existing facts, her insolvency and the lost litigation she invoked as her source of repayment, that were collateral to the parties' bargain and

induced Plaintiffs to part with their money in the first place. Plaintiffs' injury is the out-of-pocket loss of the money they were deceived into advancing and that has not been repaid, $85,000, pleaded in the alternative to the First Cause of Action and with no double recovery, together with prejudgment interest. Defendants' conduct was knowing, intentional, and willful, and reflected a high degree of moral culpability, warranting an award of punitive damages in an amount to be determined at trial.

## X. SIXTH CAUSE OF ACTION: DECLARATORY JUDGMENT

*(28 U.S.C. § 2201; by both Plaintiffs against both Defendants)*

76. Plaintiffs incorporate paragraphs 13 through 23 and 45 through 51 as though fully set forth herein.

77. An actual and justiciable controversy exists concerning the parties' respective rights under the Contract and the legal effect of the March 2024 Replacement Instrument. Rubin has asserted in writing that the Contract's rate term "expired on March 1, 2024," that the parties "no longer have any agreements," and that the relationship could be closed out only on the Replacement Instrument's terms, under which Plaintiffs' payments would be deemed consumed and the relationship "paid in full," and Defendants have refused the refund accordingly. Plaintiffs contend that the Replacement Instrument was never executed and never took effect, by its own Section 8(C), and that the original Contract remains in force.

78. Plaintiffs are entitled to a declaration that the March 2024 Replacement Instrument was never executed, never took effect, and is void and of no legal effect; that the original April 2023 Contract, including the Refund Agreement and the Condition 5 exclusivity, remains in full force; and that Plaintiffs are entitled to enforce the Refund Agreement and the exclusivity provision according to

their terms. Such a declaration is necessary and appropriate to settle the parties' ongoing rights and to clarify the legal effect of the Replacement Instrument going forward, including the continuing force of the three-year exclusivity, which Plaintiffs' claims for past damages do not fully resolve.

## XI. JURY DEMAND

79. Plaintiffs demand a jury trial on all issues so triable.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment:

(a) On the First Cause of Action, against Lead Safe Mama, LLC, in the amount of $85,000, plus prejudgment interest at 9% per annum on each unpaid installment from its due date;

(b) On the Second Cause of Action, against both Defendants, jointly and severally, in an amount to be determined at trial;

(c) On the Third Cause of Action, against Lead Safe Mama, LLC, in the amount of $30,498, plus prejudgment interest;

(d) On the Fourth Cause of Action, in the alternative, to Plaintiffs against both Defendants, restitution in an amount to be determined at trial;

(e) On the Fifth Cause of Action, against both Defendants, jointly and severally, and in the alternative to subparagraph (a) to the extent of overlap, out-of-pocket damages of $85,000, prejudgment interest, and punitive damages in an amount to be determined at trial;

(f) On the Sixth Cause of Action, the declarations set forth in paragraph 78;

(g) Costs and disbursements of this action; and

(h) Such other and further relief as the Court deems just and proper.

Dated: New York, New York

    June 17, 2026

                Respectfully submitted,

                **ISHIMBAYEV LAW FIRM, P.C.**
By: /s/ Dmitriy Ishimbayev
    Dmitriy Ishimbayev, Esq.
    1 World Trade Center, Suite 8500
    New York, New York 10007
    Email: di@ishimbayev.com
    Attorneys for Plaintiffs